UNITED STATES *v.* IWAI & CO. (LTD.) ET AL. (No. 3119)[1]

United States Court of Customs Appeals, February 16, 1929

*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter* and *Philip Stein*, special attorneys, of counsel), for the United States.
*Frank P. Wilson* (*Bert Hanson* of counsel) for appellees.
*Lamb & Lerch* (*John G. Lerch* of counsel) amici curiae.

[Oral argument December 3, 1928, by Mr. Igstaedter, Mr. Hanson, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court in reappraisements Nos. 11274–A, 11448–A, 11535–A, and 11729–A. The imported merchandise consists of silk piece goods exported from Japan. It was entered at its export values. It was

[1] T. D. 43265.

appraised at higher values, which, it is claimed by the Government, were its foreign values.

Importers appealed to reappraisement.

The sole question presented to the courts below was: Did the merchandise have foreign values on the dates of exportation, and, if so, were those values higher than the export values?

On the trial before the associate justice, sitting in reappraisement, considerable testimony was introduced by the parties. The associate justice entered a judgment affirming the appraised values. Thereupon, importers filed an application for a review of the judgment of the associate justice, in pursuance of the provisions of section 501 of the Tariff Act of 1922, the pertinent part of which reads as follows:

SEC. 501. * * * The decision of the general appraiser, after argument on the part of the interested parties if requested by them or by either of them, shall be final and conclusive upon all parties unless within ten days from the date of the filing of the decision with the collector an application for its review shall be filed with or mailed to said board by the collector or other person authorized by the Secretary of the Treasury, and a copy of such application mailed to the consignee, or his agent or attorney, or filed by the consignee, or his agent or attorney, with the collector, by whom the same shall be forthwith forwarded to the Board of General Appraisers. Every such application shall be assigned by the Board of General Appraisers to a board of three general appraisers, who shall consider the case upon the samples of the merchandise, if there be any, and the record made before the general appraiser, and, after argument on the part of the parties if requested by them or either of them, shall affirm, reverse, or modify the decision of the general appraiser or remand the case to the general appraiser for further proceedings, and shall state its action in a written decision, to be forwarded to the collector, setting forth the facts upon which the finding is based and the reasons therefor. The decision of the Board of General Appraisers shall be final and conclusive upon all parties unless an appeal shall be taken by either party to the Court of Customs Appeals upon a question or questions of law only within the time and in the manner provided by section 198 of an Act entitled "An Act to codify, revise, and amend the laws relating to the judiciary," approved March 3, 1911.

The Appellate Division of the Customs Court, in reversing the judgment of the associate justice, held that the involved merchandise had no foreign values on the dates of exportation and that its dutiable values were the export values stated in the opinion of the court.

Foreign and export values are defined in section 402 of the Tariff Act of 1922, the pertinent part of which reads as follows:

SEC. 402. VALUE.—(a) For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If neither the foreign value nor the export value can be ascertained to the satisfaction of the appraising officers, then the United States value;

(3) If neither the foreign value, the export value, nor the United States value can be ascertained to the satisfaction of the appraising officers, then the cost of production;

*      *      *      *      *      *      *

(b) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition. packed ready for shipment to the United States.

(c) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Counsel for the Government and *amici curiæ* contend that the merchandise had foreign values on the dates of exportation; that, when merchandise of this character was sold for home consumption, the Government of Japan levied a textile consumption tax thereon; that such tax is a part of the foreign values of the merchandise; and that the foreign values are in excess of the export values by the amount of the tax, which, it is claimed, is 10 per centum of certain standard values (not market values) fixed by the Government of Japan. It is also claimed by the Government that the court below wrongly construed the statutory definition of "foreign value." With regard to the latter contention it is argued that, if it should be held that there is substantial evidence in the record tending to prove that such or similar merchandise was not bought and sold in Japan for home consumption, there is, nevertheless, no evidence tending to prove that such or similar merchandise was not "offered for sale for home consumption"; and that there is nothing in the record to show that the prices at which the merchandise was sold for export to countries other than the United States were not higher than the export values of the merchandise. It is further vigorously contended by the Government that there is no substantial evidence in the record to sustain the judgment below.

It is contended by appellees that the involved merchandise was neither sold nor offered for sale for consumption in Japan; that it had no foreign value; and that there is substantial evidence to sustain the judgment below.

It is the duty of the Appellate Division of the Customs Court, in reviewing a judgment of an associate justice in reappraisement cases, to determine the facts in accordance with the weight of the evidence. *Downing & Co. et. al.* v. *United States*, 15 Ct. Cust. Appls. 235, T. D. 42243. The jurisdiction of this court in such cases is limited to questions of law only. Accordingly, if the judgment of the Appel-

late Division of the Customs Court is supported by any substantial evidence, it must be affirmed. Authorities need not be cited in support of this proposition.

The record is voluminous, and it would unnecessarily extend this opinion to enter upon a discussion of the evidence in detail. It may be fair to say that it is somewhat contradictory. That offered by the Government tends, to some extent at least, to show that the merchandise is sold in the markets of Japan for consumption there. However, after a careful analysis of the evidence offered by appellees, we are satisfied that the judgment of the court below is sustained by substantial evidence. It is unnecessary to refer to all of this evidence.

We quote from the affidavit of Yoshikata Nishida, who, with reference to merchandise like that involved, said:

* * * I am a wholesale dealer in silk piece goods with an office at 19 Honcho 1 Chome, Yokohama, Japan, and have been in the wholesale silk business for 20 years and am familiar with the wholesale silk trade in Japan and a member of the Yokohama Silk Merchants Association and municipal council of Yokohama.

That I have sold in wholesale quantities for export to the United States since September, 1922, silk piece goods of the following descriptions:

  *    *    *    *    *    *    *

That attached to, accompanying, and made a part of this affidavit are samples of silk piece goods in which deponent deals and sells at wholesale to the exporters to the United States and has so sold as a matter of daily business since September, 1922, and at the present time described as follows:

  *    *    *    *    *    *    *

That the said samples are *known and dealt in at wholesale in Japan as export silk goods*. They are *manufactured and sold for export* to the United States and other countries. They differ from the silk piece goods manufactured and sold for home consumption in Japan in that they are of wider widths and of lighter momme weights. The silks which are used by the Japanese people in the country of Japan and which are dealt in at wholesale in the Japanese markets for home consumption are approximately 13½ inches wide and yarn dyed, and are usually different in their constructions and designs from the export fabrics. Kyoto is the principal market for domestic goods. Prior to the earthquake in September, 1923, Yokohama was the principal market for the export silk goods, but since September, 1923, the chief business in the export goods has been done in Kobe.

There is in Japan a textile tax of 10% of a standard value assessed and levied in each of the eight tax districts of Japan on all textiles sold for home consumption. No tax is levied on the export goods, and they are delivered without payment of tax. If any of the export goods are diverted from the regular channels and are consumed in the country, then a consumption tax is paid on them unless they are cut up and used for costumes for foreigners, which is considered a sale for export, and no tax is paid.

A sale of the export goods, such as samples herein, for home consumption is not usual wholesale transaction and only happens when we have orders cancelled or goods rejected on us and then if we can not sell other people for export. Some people have found they could get these rejected and cancelled goods at bargain prices and sell them to shops. They come around to the different wholesalers

and buy a few pieces at a time but they do not pay the export price as these men sell to stores who cut the export goods in the middle and their value is much less than the usual commercial two-selvage merchandise.

When wholesalers of these export goods sell to the men who come around as stated the sale is reported to the tax collector and the consumption tax is paid and is included in the sales price.

The selling of these export goods for home consumption is not a regular business of wholesale and not for profit but to save from loss, and we do not get full export price, neither can we ever sell more than a few pieces at a time as there is no regular market, and we dispose of what we can not sell for export at best advantage to us. (Italics ours.)

The witness, F. D. Burrows, of Cooper & Co. (Ltd.), of Yokohama, stated that he had been in the silk business for 17 years. With reference to merchandise like that involved he said:

\* \* \* These are known in the trade as "export goods" and they are not sold in the Japanese market for home consumption. The average Japanese would not recognize these goods as anything which he could use for his usual personal or domestic requirements. The Japanese fabric used in the country and bought and sold for home consumption is a fabric of narrow width, of entirely different weave and texture. These export goods could not be used economically for the domestic trade as they are not suitable for such trade in either width or quality.

In my experience of seventeen years in the principal markets of Yokohama and Kobe, I have never known these export fabrics to be sold for home consumption. In all the quantities handled by Messrs. Cooper & Co. Limited, we have never sold such goods for domestic consumption.

All of *these export goods are made to meet conditions in foreign markets.* (Italics ours.)

The witness Stanley Edward Unite testified that he had been in Japan since December, 1899, as a buyer of merchandise of the character of that involved in this case. He said:

\* \* \* This merchandise is known in Japan as export goods and has been so known during all of deponent's experience. These silks are manufactured especially for export to foreign countries *and are not being bought, sold, or dealt in for domestic consumption in Japan.* There is no demand for such goods by the Japanese people and no market exists where such goods are bought and sold for home trade. The silks used for Japanese consumption are different from these export goods in character, style, weave, and width. (Italics ours.)

George B. Spain, export manager of A. Cameron Co. (Ltd.), of Kobe, Japan, with reference to merchandise like that involved, said:

\* \* \* These are of a class of silk textiles known as export silks. They are entirely different from the silks used in Japan, and these export silks are not sold at wholesale in any market in Japan for home consumption.

The export silks are different in construction, texture, weight, and use from the domestic silks. The market for export silks is at Yokohama and Kobe. The market for domestic silks is at Osaka, Fukui, Tokio, etc. The domestic silks are narrow widths, very much heavier in momme weight, different in their method of weave and much higher in cost. The domestic silks are yarn dyed and are not used in the white by the Japanese people except for mourning purposes. The export silks represented by the samples attached to this affidavit are freely sold

for export to the United States and other countries. In ·Yokohama and Kobe there is no textile or consumption tax paid upon these goods, as they are made solely for export. Should any of these export silk piece goods be damaged or unfit for exportation, they are usually converted into handkerchiefs and exported without payment of tax. *No market exists anywhere in Japan where these export piece goods or rejects are offered for sale. They are made solely for export, and if they can not be exported by reason of damage, the dealer has to dispose of them at any price he can get to save himself from loss. They can not be used by the Japanese people in the widths and conditions in which they are exported.* They are never sold in the home market at a price, tax included, equal to the export price. (Italics ours.)

The witness Zenjuro Horikoshi, senior partner of Z. Horikoshi & Co., of Tokio and New York City, referring to merchandise like that imported, said:

\* \* \* For a long period of time we have sent to Mr. Hart at New York City a list of prices of export silks in which we deal. The prices have always been obtained under my personal supervision and direction, and I know that the prices in the lists sent to Mr. Hart represent the prices at which the merchandise therein described is freely offered for sale for export to the United States on the date stated in the letter. *In no instance have we ever sent to Mr. Hart quotations for domestic consumption, as there are never any quotations or offers.* There exists a daily market in which the merchandise named in our lists is sold in wholesale quantities for export to the United States and other countries. There is no market in which such merchandise is sold in wholesale quantities for domestic consumption in Japan. (Italics ours.)

The testimony hereinbefore quoted was corroborated by other evidence. It appears that when textiles are sold for home consumption the Government of Japan levies thereon a textile consumption tax of approximately 10 per centum of certain standard values (not market values) fixed by the Government. This tax is not levied, however, upon merchandise sold for export to foreign countries. We think the evidence substantially shows that the involved merchandise was neither sold nor freely offered for sale to all purchasers in the principal markets of Japan in wholesale quantities and in the ordinary course of trade for home consumption; and that it was manufactured solely for export. As it was freely offered for sale for export to countries other than the United States, counsel for the Government contend that it had foreign values.

Counsel for the Government have stated the issues in the case and their contentions in regard thereto in the following language:

The Government contends there is a "foreign value" for the merchandise in question; that there is a tax which is levied when the merchandise is sold in the country of exportation; *that such tax is not levied when the merchandise is exported; and that the foreign value exceeds the export value by the amount of the tax.* (Italics ours.)

Counsel have not only conceded, but they have declared, that the only difference between the foreign values and the export values is the amount of the textile tax; and that the tax is not levied when the

merchandise is exported. This being so, counsel are not consistent in arguing that the alleged foreign values (the prices at which it was sold or freely offered for sale for export to countries other than the United States) were, or might be, higher than the export values. On the contrary, we are of opinion that the admissions of counsel are consistent with the proposition that the prices at which the merchandise was freely offered for sale for export to countries other than the United States were not higher than the export values found by the court below. We find it unnecessary, therefore, for the purposes of this opinion, to construe the statutory definition of "foreign value" for the purpose of determining whether, when merchandise is not freely offered for sale for home consumption, foreign value may be established by proof of the price at which it was freely offered for sale for exportation to countries other than the United States.

It has been established that so-called rejects, which the record shows are defective or damaged pieces, are sold for home consumption. And sometimes, but rarely, and only when orders for export are canceled, exportable pieces are disposed of in Japan. But it also appears by substantial evidence that there is no wholesale market for such merchandise; that it is sold for whatever prices may be obtained; and that these prices, with the textile tax included, are always less than the export values.

Counsel for the Government and *amici curiae* contend that the testimony of appellee's witnesses has been contradicted, and that the testimony is open to a construction consistent with the contention of the Government. We might consider these arguments if we were permitted to consider the weight to be given to the testimony. However, we may not, under the law, consider the evidence for this purpose.

As the evidence is substantial, and as it is consistent with the decision of the Appellate Division of the Customs Court, the judgment should be and, accordingly, is *affirmed*.