NIPPON DRY GOODS CO. *v*. UNITED STATES

No. 4704.—Invoice dated Yokohama, Japan, November 15, 1935.
    Certified November 16, 1935.
    Entered at San Francisco, Calif., December 4, 1935.
    Entry No. 6048.

(Decided January 19, 1940)

*Lawrence & Tuttle* (*Frank L. Lawrence* and *George R. Tuttle* of counsel) for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*Joseph F. Donohue, Samuel D. Spector, John J. McDermott, Richard H. Welsh,* and *William J. Vitale*, special attorneys), for the defendant.

CLINE, Judge: This is an appeal for a reappraisement of certain wearing apparel made of rayon fabrics. The merchandise was imported from Yokohama, Japan, on November 16, 1935, and, upon entry thereof at the port of San Francisco, the importer added the total amount of 165.86 yen to the invoice value to meet advances made by the appraiser on merchandise covered by entries 6532, 6785, and 10238. The amounts added to the various items are noted in lead pencil on the invoice opposite the extended total value of the items. A so-called "duress" certificate attached to the invoice contains the following:

It is contended that duty should be assessed on the basis of a value exclusive of the items specified; in other words, that the Japanese textile tax is not a part of dutiable value.

Items: Japanese textile tax of 4 percent on all rayon and/or woolen goods articles equals Yen 165.86.

The merchandise was appraised at its entered value which included the amount added under duress by the importers. Counsel for both parties agree in their briefs that the question involved is whether or not an amount equal to a certain Japanese consumption tax should be added to the invoice value of the merchandise to make foreign value.

Evidence was introduced in this case on July 10, 1936, February 23, 1938, June 15, 1938, and March 15, 1939. At the trial on March 15, 1939, objections were made to the receipt of certain documentary evidence. The exhibits were marked for identification and the objections taken under advisement. These objections will be disposed of first.

The plaintiff offered an affidavit of Kazo Takemura executed in San Francisco on June 7, 1938, and, on objection thereto, it was marked "Exhibit 7 for identification." The record shows that the objection was made to the receipt of the affidavit on the ground that Kazo Takemura is not the author thereof as an inspection of it would indicate that it could not have been drawn by a Japanese. At the close of defendant's case, counsel for the Government raised a further objection, namely, that the affidavit does not comply with the provisions of section 501 of the Tariff Act of 1930 because it is not shown that the personal attendance of the witness could not reasonably be had at the trial.

The plaintiff called Mr. James G. Otagiri as a witness. He testified that he was the secretary of the importing company and that Mr. Kazo Takemura was in Japan at the time of that hearing (March 15, 1939); that the affidavit was sworn to in his presence by Mr. Takemura on June 7, 1938; that Mr. Takemura, whose place of business is in Yokohama, Japan, came to the United States in May 1938 and remained 3 or 4 months; that the next day after he executed the

affidavit he left for New York but later he returned to San Francisco from which place he sailed for Japan. The plaintiff called also Mr. Minoru Iino, an attaché of the consul general's office in San Francisco, who testified that he was able to read and speak both the English and the Japanese languages; that on June 7, 1938, he accurately and truthfully interpreted the affidavit and read it to Mr. Takemura, who swore to the same, and that he, the witness, also signed the document on the last page before a notary public.

In the brief filed by counsel for the defendant the only reason urged for rejection of the affidavit is that it was executed in San Francisco and the affiant was present in San Francisco on June 8, 1938, which is 5 days prior to the beginning of the court's calendar at that port and the presence of the affiant before the court could easily have been accomplished. The record discloses that the affiant executed the affidavit on June 7, 1938, and left the next day for New York and that subsequently he returned to San Francisco and sailed for Japan; that the case was called for trial in San Francisco on June 15, 1938, which is 8 days after the affidavit was executed; that at that hearing counsel for the Government moved for a continuance on the ground that he was not ready to proceed. This is shown by the following excerpt from the record of the hearing on June 15, 1938:

Mr. TUTTLE. This case has been partially tried and if the Government is ready to try its case, we are ready. But we don't want to put in all of our evidence and have the case continued to another docket.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Mr. McDERMOTT. The Government is not ready.

Judge EVANS. How long has this case been on?

Mr. TUTTLE. The matter was first tried two years ago.

Judge EVANS. It seems to me everything ought to have been ready in that time.

Mr. McDERMOTT. I have correspondence to the effect our office requested another special agent's report, and that report has not been received as yet.

Judge EVANS. Well, what are you doing? Are you asking for a continuance?

Mr. McDERMOTT. I am asking for a continuance of two dockets.

Judge EVANS. Continued at the request of the Government for two dockets.

On this state of the record it is obvious that counsel for the plaintiff can not be censured for failing to offer his evidence at the hearing on June 15, 1938. Exhibit 7, for identification, was offered in evidence at the trial on March 15, 1939, which is over 9 months after it was executed, and the affiant was not in the United States at that time. If the affidavit had been offered when the affiant was present in the United States and was available as a witness at the place of hearing, that might alter the situation. It may be well to point out that in the case of *United States* v. *Arthur Schuster et al.*, Reap. Dec. 4328, 73 Treas. Dec. 1594, an affidavit executed in El Paso, Tex., the day before the trial at El Paso was admitted in evidence upon a showing that the affiant lived in Chihuahua, Mexico, which is 200 miles distant

from El Paso, and, in *Hensel, Bruckmann & Lorbacher, Inc.* v. *United States*, Reap. Dec. 4209, 73 Treas. Dec. 1350, affidavits of persons residing in the United States, but not in New York, where the hearing was held, were admitted. When the case was before the Third Division of the court on appeal (*United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 1 Cust. Ct. 591, Reap. Dec. 4376), counsel for the Government argued that the admission of the affidavits was error but the court held that the admission of such evidence was within the discretion of the trial court. Upon rehearing of the case, however, the court reviewed its decision on that point and held that, since an objection was made to the admission of the affidavits on the ground that it was not shown that the witnesses could not be produced at the trial, such objection should have been sustained in the absence of evidence showing that the witnesses were not available. *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, Reap. Dec. 4523. The court said:

The language is plain that affidavits may be admitted of persons whose attendance cannot reasonably be had. It is our opinion that, when timely objection is made to the admissibility thereof upon the ground that the attendance of the affiants might be had in court, such objection should be sustained unless and until a proper showing is made upon the part of the party offering the affidavits that the attendance at the trial of the persons executing the same cannot reasonably be had. In the event of such a showing being offered or made, it is for the court to determine whether they are to be admitted or excluded.

The argument of counsel for defendant in his brief is limited to the availability of the witness at the trial on June 15, 1938, when the Government was not ready to proceed and asked for a continuance of the case. The question of whether the affiant was available to testify when his affidavit was offered on March 15, 1939, is not raised but testimony was introduced by the plantiff showing that the witness was in Japan at that time. This is sufficient to show that the testimony of the witness could not reasonably be produced at that trial, and, under the rule announced by the court above quoted, the objection is overruled. The objection to the affidavit on the ground that an inspection thereof indicates that it could not have been written by a person of Japanese nationality is not well taken since it is a matter of common knowledge that affidavits are often prepared by attorneys after they have ascertained the facts regarding which the affiant wishes to testify, and, in view of the testimony of witness Iino, who interpreted the affidavit and read it to Mr. Takemura, it is obvious that the affiant understood the statements in the affidavit before he executed it. This objection is overruled and the document will be received in evidence and marked "Exhibit No. 7". Counsel for defendant is granted exception to the ruling.

Counsel for the plaintiff objected to the receipt in evidence of report 35–331, dated November 12, 1935, signed by Treasury Attaché

Martin G. Scott, which was marked "Exhibit No. 8 for identification." The grounds of the objection are that the contents of the report are irrelevant to the issue herein involved. The report purports to give the standard valuations of silk fabrics, of silk and rayon fabrics, and of rayon fabrics, and nothing appears therein relating to articles made of rayon fabrics or to the assessment of the Japanese consumption tax thereon. The objection is sustained with exception granted to defendant.

Counsel for the plaintiff objected to report number K36–191, dated December 30, 1936, signed by Acting Treasury Attaché E. W. Daley, which was marked "Exhibit No. 10 for identification." The objections are that the report refers to certain "old regulations" but fails to state what the old regulations are; that the report purports to interpret the Japanese textile law and no qualifications to interpret laws are shown by the acting Treasury attaché; that there is nothing in the report which shows that the acting Treasury attaché understands the Japanese language; and that the report states conclusions. The objections relate to the weight to be attached to the statements in the report, and, inasmuch as all statements in the report are not subject to these objections, the same are overruled with exception granted the plaintiff. The report will be marked in evidence as "Exhibit No. 10."

Counsel for the plaintiff objected to a report, number Y37–28, dated March 17, 1937, signed by Treasury Attaché Martin G. Scott and Treasury Representative J. A. Sutcliffe, marked "Exhibit 11, for identification." The grounds of the objection are that the report purports to interpret the Japanese textile law as it is administered by the Japanese authorities and no qualifications are shown entitling the parties who signed it to make the statements that are contained therein and qualifications are not shown as to their ability to interpret the written Japanese language. These objections relate to the weight to be attached to the statements in the report and as the report contains other facts discovered by the Government agents in their investigation, the objection is overruled, with exception granted the plaintiff. The report will be marked in evidence as "Exhibit No. 11."

At the initial hearing of this case on July 10, 1936, the plaintiff introduced the testimony of Mr. Shi Komatsu who has been connected with the importing firm as buyer since 1921 and who now occupies the position of director and assistant general manager. The witness testified that for the past 5 years he had visited Japan each year and remained there for 3 or 4 months at which times he bought merchandise and studied the market; that he is familiar with the manufacture and course of trade in rayon goods in Japan.

Samples representing various invoice items were identified by the witness and the same were admitted in evidence. The exhibit numbers and the invoice items they represent are as follows:

Exhibit 1, Item 44/289, 50″ Emb'd Rayon Kimono
Exhibit 2, Item 43/201, Emb'd Rayon Satin Kimono
Exhibit 3, Item 46/85, Emb'd Rayon Crepe 2 pc. Pajama
Exhibit 4, Item 70/43, Emb'd Brocade Rayon Slipper
Exhibit 5, Item S6607, Emb'd Rayon Happi Coat

The witness testified that invoice items 44/84, 44/82, and 44/91 are made of exactly the same material as Exhibit 5 but are of different styles; that invoice items 46/83, 46/201, and 46/87 are made of the same material as Exhibit 3 but the articles have different cut and different embroidery; that invoice items 43/76 and 43/204 are made of the same material as Exhibit 2; that all the articles on the invoice where the initial figures in the item numbers are the same, were made of the same materials as the exhibits in this case having that number in the item number; and that his testimony related to all the different rayon articles on the invoice.

The witness testified further that the invoice prices are the prices agreed to be paid by his company; that they are the export prices and do not include the Japanese consumption tax; that Takemura Co., the shipper of the goods herein involved, is located in Yokohama, is the buying agent for the importer and receives a commission for buying; that the manufacturer in Japan submits samples to Takemura and Takemura sends the same to the importers and if they decide to buy, they place the order with Takemura who purchases the goods and ships them. The witness testified further that when he is in Japan he visits the factories where rayon goods are woven; that the rayon factories are located in the Fukui district where there are about 20 to 30 factories; that after the material is produced it is dyed in Yokohama after which it is cut and embroidered and given to another factory to sew; that he buys chiefly from Kikusui Shokai through Takemura Co.; that rayon fabrics are woven in widths of 12, 24, 27, 30, 36, and 40 inches and sometimes in 29 and 32 inches; that for domestic use in Japan they use the 12- and the 24-inch widths; that the wide widths are used for export; that the Japanese do not use the wide widths of materials like those in the exhibits; that Japanese women use heavier weight material of different quality and texture and nobody in Japan uses the cut and shape of the articles in the exhibits or the kind of embroidery thereon; that Exhibits 1, 2, 4, and 5 are made of 27-inch material and Exhibit 3 is made of 36-inch goods.

On cross-examination the witness testified that the Japanese consumption tax was not paid on the materials of which the exhibits were made; that the tax is always paid on the material and is not paid on completed articles made therefrom. The witness admitted, however,

that he was not familiar with the individual responsibility of the person paying the tax and that he did not know the details of the Japanese consumption-tax law.

When Exhibit 1 was offered in evidence, counsel for the defendant, in cross-examining the witness with regard to the sample, asked the question "Your invoice states that this was shipped from Okuzawa Shoten. Is that the name of the manufacturer?" and the witness answered "Yes." He afterwards testified that Okuzawa Shoten was the manufacturer of the rayon material. When Exhibits 2, 3, and 5 were offered either the witness or his counsel agreed that the kimonos and the pajamas were made under the same conditions. An examination of the invoice indicates that counsel for the defendant erred in stating that the invoice showed that Okuzawa Shoten shipped the merchandise herein involved for it appears on the invoice that certain white cotton piece goods were bought from Okuzawa Shoten and that the articles herein involved were bought from Kikusui Shokai. It appears from the main cross-examination of the witness, however, that the manufacturers of the articles do not make the materials. The witness may have misunderstood the question asked him previously, but he testified clearly on the subsequent cross-examination that the manufacturers of the articles buy the materials from which the articles represented by the exhibits were produced and make the articles from those materials, but the embroidery work was done in little factories or in private homes under the supervision of those manufacturers.

The witness testified further that the goods represented by the exhibits in this case were manufactured specially for sale to the United States; that rayon kimonos similar to those herein involved are sold in Japan to tourists but kimonos made of the kind of fabric that is in the exhibits are not in the Japanese market for home consumption; that the kind of fabric in the exhibits is not in the market for use of the Japanese natives; that pajamas are not worn by the Japanese but rayon crepe pajamas similar to Exhibit 3 are sold in Japan to tourists; that the embroidery designs on the various exhibits are different from those used on articles commonly used in Japan; and that the native Japanese use fabrics of more subdued color, such as white, black, and pastel shades. He admitted that sometimes he had imported white kimonos, black kimonos, and garments of more subdued tones for the American trade and that he had imported kimonos embroidered with a crest only, which is embroidery of a different type from that on the exhibits, but he stated that the nature of the embroidery on garments having a crest thereon is the same as that on the exhibits.

The witness testified further that Takemura buys for some other importers in the United States and that he handles orders for importers in England, South America, New Zealand, and Poland.

On redirect examination the witness testified that the black and the white kimonos imported for use in the United States are made of a material different in quality and texture from those used by the Japanese women and the cut is different because the Japanese women do not wear the large-sized garments used by the American women. The witness testified further that all he knew about the Japanese consumption-tax law was told him and was hearsay, but he knew from personal experience that the tax is not paid on goods for export.

On recross-examination the witness testified that when he buys garments from Takemura he pays the price asked for the articles and he can not tell whether the consumption tax has been added in the price but from his experience he knows that he does not pay the tax.

At the hearing on February 23, 1938, the plaintiff called for Mr. Charles J. Evans, who was the appraiser at San Francisco during the years 1935 and 1936. He testified that in his absence Mr. Thomas E. Hearty was acting appraiser and made the appraisement of the merchandise covered by this case; that for the reason that this was a duress entry there were no additions made upon the invoice by the appraiser and there is no statement on the invoice showing whether the merchandise was appraised on the foreign value or on the export value. The attention of the witness was directed to items on the invoice having an addition made thereto in lead pencil and he testified that from an inspection of the invoice it would be his understanding that the different amounts were added to make foreign value; that he believed there was an export value for the merchandise at the time of shipment and he assumed that the additions made on the invoice represented the difference between the foreign value and the export value; that to the best of his knowledge the invoice value, exclusive of the amounts added in pencil, represents the export value at the time of shipment.

At the trial on June 15, 1938, after the case had been continued on the request of the Government, counsel for the plaintiff requested the privilege of calling the witness Thomas E. Hearty who examined the merchandise the value of which is here in issue. He testified that he appraised the merchandise herein involved on the basis of foreign value; that there was an export value of the goods at the time of exportation and that value is the unit invoice value of each article; that the unit invoice values plus the textile tax represents the foreign values. On cross-examination, he testified that the basis of his knowledge was obtained from a report of an investigation made by a Treasury attaché in Japan; that he appraised the merchandise at the entered value and considered the figures in lead pencil on the invoice as part of the foreign-market value of the goods.

At the hearing on March 15, 1939, the plaintiff offered two affidavits in evidence and the defendant offered six reports of Government agents located in Japan. Objections to some of these exhibits have been considered heretofore.

Exhibit 6 is an affidavit of Naojiro Yamamoto executed before the Vice Consul of the United States at Yokohama, Japan, on February 23, 1939. It appears from this exhibit that the affiant is the owner and manager of the firm of Yamamoto Naojiro Shoten of Nakaku, Yokohama, Japan, and has personally conducted the business of the firm for 30 years; that during this time the affiant has been buying at wholesale, and selling at wholesale and retail, rayon fabrics and articles made therefrom; that also he manufactures kimonos, pajamas and other articles from rayon fabrics; that he has exported articles made of rayon to the United States and to other countries; that because of his experience he has become entirely familiar with market requirements, prices, types of goods sold, and the administration of the Japanese textile consumption tax law so far as it relates to rayon and silk fabrics and articles; that most rayon piece goods are woven in Fukui, Ishikawa, Joshu, and Kyoto and the principal places where such goods are manufactured into clothing and other articles and sold at wholesale are Yokohama, Kyoto, and Kobe; that piece goods are woven in definite widths of 13½, 26, 27, 28, 29, 36, and 45 inches and these widths are used for two different purposes; that the 13½-inch fabrics are made into clothing and articles for consumption in Japan and the other widths are used for export as piece goods or are used to manufacture clothing and articles for exportation to the United States and other countries; that the reason why only the 13½-inch fabrics are consumed in Japan is that by custom all Japanese kimonos made from rayon contain a seam at the center of the back and thus require that a narrow width be used; that if wide-width fabrics were used to make such garments this seam could not be obtained except by cutting the fabric; that as it is the custom in Japan to take garments apart when they are cleaned, it is necessary to use fabrics with a selvage on both sides, such as the 13½-inch width, otherwise one side of the fabric would unravel and thus become unfit for use; that the instruments or equipment commonly used by the Japanese people when laundering, ironing, or repairing their garments are constructed to be used with narrow-width fabrics, and as the front and back of the garments are often interchanged when being cleaned, it is not practical to use fabrics wider than 13½ inches; that for these reasons and in accordance with long practice rayon fabrics of more than 13½ inches in width are not sold in Japan, but are exported to the United States and to other countries; that an exception exists as to articles made from wide-width fabrics which are sold by retail stores located in Yokohama and Kobe; that these stores purchase rayon articles at wholesale

in quantities of one or two dozen at a time; that their sales are made at retail and are mainly to the tourist trade, the stores being generally known as tourist shops; that the great majority of their sales are to the tourists or to foreigners living in Japan; that during the past 5 years he has frequently visited such shops and has observed the type of rayon articles sold by them and that they are different from the rayon articles exported to the United States, in that they are made of better quality fabric and are more expensive.

With regard to the administration of the Japanese textile consumption-tax law, the affiant states:

6) That in the course of my business experience of selling and manufacturing rayon articles I have become familiar with the operation and administration of the Japanese textile consumption-tax law, which has been in effect since 1910, and therefore I know that under this law certain fabrics, including rayon, are taxed as follows:

The tax on narrow-width fabrics (13½ inches) intended for consumption in Japan is paid to the Japanese government by the manufacturer at the time the fabrics are made. Inasmuch as wide-width fabrics (over 13½ inches) are made for export trade and because all exported goods are exempt from tax under the Japanese textile consumption-tax law, no tax is collected from the weaver or from any manufacturer making garments or articles from such fabrics.

In respect to wide-width fabrics or to garments or articles made therefrom and sold by tourist shops, the textile tax is not paid to the government by the tourist shop until an actual sale has been made; in other words, merchandise on display in such stores is not subject to tax. Upon the sale of such an article to a resident of Japan the store is required to pay the tax. If, however, a sale is made to a tourist who is not a resident of Japan no tax is paid, providing that the goods purchased are delivered to the steamer on which he is travelling, and in case the goods are not delivered to the steamer the tax is to be paid after the sale is made. This tax is not a part of the wholesale transaction when the tourist shop purchases the merchandise. The manufacturers sell and freely offer for sale articles made from wide-width fabrics at prices which do not include the tax.

In considering the extent of the business transactions in rayon fabrics, and articles made of such fabrics, in Japan, the affiant states:

7) That in conducting my business I have made it a practice to inform myself as to the quantities of rayon fabrics manufactured in Japan and the quantities exported to other countries; that, because I export rayon fabrics or articles to the United States and to other countries I am familiar with the approximate amount of such exported goods; that during the year 1935 export rayon fabrics valued at approximately Yen 134,000,000 were manufactured in Japan; that the value of such fabrics and articles exported to the United States was approximately Yen 2,000,000, and that the value exported to countries other than the United States was approximately Yen 136,000,000, and that although there is no exact data available showing the value of rayon fabrics and articles sold by tourist shops, approximately Yen 300,000 is sold at retail each year. Generally speaking, tourists do not like articles made of rayon.

The affiant states further that during the year 1935 the sales of rayon articles for exportation to all foreign countries, including the United States, were made at the same prices for articles of the same

type and the usual wholesale quantity involved in sales for export to countries other than the United States was approximately 100 dozen of a value of 1,000 yen.

Exhibit 7 consists of an affidavit of Kazo Takemura, executed in San Francisco on June 7, 1938. It appears from this exhibit that the affiant is the president of Takemura Co. Ltd. of Yokohama, Japan, the shipper of the goods in this case; that for 40 years he has been engaged in the business of buying and selling in the wholesale trade of Japan fabrics and articles composed of silk, rayon, wool, and other materials; that his company is a member of the silk association, which includes rayon; that during the past 6 years 75 per centum of his business has been in rayon goods; that Takemura Co. has acted as purchasing agent in Japan for the Nippon Dry Goods Co. of San Francisco and other American importing houses; that the prices at which such merchandise has been invoiced are the prices at which it was actually bought on account of said company; that also they are the prices, at the time of exportation of such merchandise to the United States, at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of Japan for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade, and that this statement is particularly true as to the rayon goods shipped by Takemura Co. to Nippon Dry Goods Co.; that rayon fabrics are woven in the Fukui, Gifu, Joshu, and Kanazawa districts of Japan and a few other districts; that sales are conducted under the supervision of the association or guild to which the manufacturer belongs; that fabrics thus sold are dyed, made up into wearing apparel, embroidered or otherwise processed, and the finished articles are sold by the manufacturer at wholesale for either domestic or export market; that the manufacturing and other processes mentioned occur generally in Kyoto and Yokohama; that there are two separate and distinct classes of rayon fabrics manufactured in Japan, namely, those of narrow widths (13½ inches wide), which are manufactured solely for use by the Japanese people, and those of greater width, ranging from 26 to 45 inches, which are known as export goods and are manufactured into articles that are not used by the people of Japan; that each of these two classes has its own distinctive weight and texture; that Japanese clothing is made with seams 13½ inches apart which require narrow fabrics with a selvage on each side; that in renovating wearing apparel in Japan the seams are ripped apart and the pieces washed and cleaned and if the fabric of the garment has a raw edge it will unravel and impair the utility of the garment; that frequently the front and the back pieces of the garments are interchanged which could not be done economically or conveniently if wide fabrics had been used.

The affiant explained the operation of the Japanese Textile consumption tax law as follows:

7.) That in the course of his extensive business experience affiant has become familiar with the operation of the Japanese textiles consumption-tax law, which has been in continuous operation since 1910, and with the application of that law to fabrics and articles of rayon of the various kinds and classes above mentioned; that on said narrow or domestic fabrics the textiles consumption tax is paid to the Japanese government, but on the wide or export fabrics it is understood by all concerned that they are intended for export and therefore no tax is paid by the manufacturer of the fabrics, or by anyone else who processes or sells the goods, except in regard to some tourist goods; that, when these wide goods are sold to tourist shops, no tax is collected until the retail sale is made; that, if the buyer carries away from the store the articles purchased by him, the retailer is required to pay the textiles consumption tax, but if the articles are delivered to a ship the tax is not paid, and that, if proper tax procedure is followed by parties to the transaction, the tax does not become payable and is not paid on rayon goods taken out of the country.

The affiant states further that in the larger cities of Japan, such as Kobe, Tokyo, and Yokohama, there are a number of shops that specialize in goods suitable for the tourist trade; that these shops carry articles made of wide export rayon fabrics but such goods are of a different commercial class from those sold for export to the United States; that the rayon articles exported to the Nippon Dry Goods Co. are all of an inferior grade and would not be acceptable either by tourists or by native Japanese; that he has never been able to sell to tourists' shops because the class of goods handled by him do not meet the strict requirements of such shops; that on June 7, 1938, he visited the office of the customs appraiser at the port of San Francisco and inspected Exhibits 1 to 5 in this case; that after careful examination thereof, with special reference to quality of fabric and of workmanship, design, ornamentation, and other features, he declares that the goods represented by the five exhibits are inferior in quality and value to any which he has ever seen carried by tourists' shops of Japan; that the exhibits are made of export type of fabrics, woven in wide pieces of a weight and texture which is characteristic of such fabrics; that he knows of no market in Japan, except for export, for goods of the qualities which have been purchased by his company on account of Nippon Dry Goods Co. and believes that the only market for such goods is the export market; and that in that market goods are invariably sold at prices which do not include any part of the Japanese textiles consumption tax.

Exhibit 9 is a report of Treasury Attaché Martin G. Scott, No. K36–105, dated June 26, 1936, which, like Exhibit 8 for identification, gives the standard valuations of fabrics made of silk, fabrics made of artificial silk, and fabrics made of a mixture of silk and artificial silk. It does not contain anything relating to *articles* made of rayon fabrics or the Japanese consumption-tax law and is not pertinent in this case.

Counsel for the defendant states in his brief that this exhibit apparently is not in point since the valuations were effective on June 15, 1936, whereas the merchandise herein involved was exported in November 1935.

Defendant's Exhibit 10 is a report of Acting Treasury Attaché E. W. Daley, No. K36–191, dated December 30, 1936. The acting Treasury attaché reports that on December 9, 1936, he visited the office of the Kobe Export Silk and Rayon Association which maintains a special consumption tax department, where Mr. J. Saito, the manager thereof, was interviewed, and from him an up-to-date text of the Japanese consumption-tax law was obtained; that the Japanese text was care-fully compared with a copy of the Japanese consumption tax law, evidently referring to a translation by the law firm of De Becker & Eldridge which is mentioned in the report, and certain amendments were noted and translated; that article 1 was revised to eliminate cotton textiles, etc., not herein involved. Statements which appear to be pertinent to this case are as follows:

This law shall be enforced as from December 1, 1931.

\* \* \* \* \* \* \*

In the case of exporting, after the enforcement of this law, textiles or articles made up of such textiles against which consumption tax has been paid before the enforcement of this law, the sum to be remitted in accordance with the provisions of Article 3, par. 2, shall be 9%.

Against textiles or articles which are made up of such textiles against which consumption tax is exempted by virtue of the provisional clause of Article 1, the provisions of Article 3, par. 2, do not apply.

It will be noted that amendments are made to Article 1; 1, (2); 2; and Article 23. In general the amendments broaden the definition of "cotton textiles," exempt certain textiles fabricated from cotton and other materials, and reduce the tax from 10% to 9%.

\* \* \* \* \* \* \*

*Articles to be taxed.*

All textiles made in Japan are taxed with the exception of those specifically exempt. See Law 49, April 1931, and Article 3 of the Textile Consumption Tax Law.

*Tax on Rayon Textiles.*

From the plain text of the law, a textile fabricated in its entirety from Rayon, or in rayon chief value would be taxable if produced for home consumption. \* \* \*

Defendant's Exhibit 11 is a report of Treasury Attaché Martin G. Scott, No. Y37–28, dated March 17, 1939. It is stated in the exhibit that the Treasury attaché interviewed Mr. K. Ogawa, assistant chief of the tax office, and secured certain information. On the question of remission of the tax on goods intended for export, the following appears:

The law provides that consumption taxes be "remitted" for "1. Textiles for export to a foreign country, or textiles which are to be exported to a foreign country after being made into manufactured goods;"

Actually this proviso of the law is liberally interpreted in order not to hamper Japan's export trade. Actually it works out about as follows:

A manufacturer engaged in manufacturing textiles for export or about to so manufacture makes application for permission to make and transport such textiles without tax payment. Such manufacturer is then in a position to accept orders from brokers or exporters who are recognized by the Government as boni-fide export houses. An order is received, manufactured and delivered to such exporter, either direct or through intermediaries without any tax payment whatever, though records must be kept showing the fabrication of the goods, their transportation and final disposition. The manufacturer is responsible for the tax on the merchandise up to its delivery to the purchaser, who is responsible for the same until its disposal to another party for export or until the same is exported by himself, whereupon all responsibility ceases. All firms handling such merchandise for export are required to keep records showing the disposal of the merchandise, which records are subject to check by Government inspectors, and such firms are subject to penalties for any irregularities.

It appears also that the Japanese consumption tax is not assessed on the market value of the fabrics but that it is assessed on certain standard valuations fixed by the tax office for each kind of textile.

Defendant's Exhibit 12 is a report of Treasury Representative J. W. Sutchiffe, Y36–102, dated November 20, 1936. This report gives the cost of production of the articles represented by the exhibits in this case. Counsel for the defendant states in his brief that the cost of production is not pertinent since the cost of production of the various articles is shown to be less than the invoice values. The Treasury representative reports that he visited the office of Kikusui Shokai and was told by the manager that the merchandise represented by the exhibits in this case was made up specially for the Takemura Co. and the goods were sold to no one else and that similar goods were not sold to anyone else and that he was told by the proprietor of Kameyama Shoten, who manufactured the slippers in this case, that the same style was not sold to anyone else but there was no restriction as to resale or destination of the goods.

Defendant's Exhibit 13 is a mimeographed copy of a report by Customs Attaché M. R. Nicholson, dated September 1, 1928, to which is attached a translation of the Japanese consumption-tax law of 1910, by De Becker & Eldridge, solicitors and international lawyers of Japan. It is stated in the report that "comparison of the English translation with the Japanese text of the law was made by William Joseph Sebald, Lieutenant United States Navy, commissioned to Japan as Language Officer for the United States Government." The particular parts of the law which relate to the remission of the tax read as follows:

ARTICLE 3

Subject to the provisions of Ordinance, consumption tax is remitted for the following:

1. Textiles for export to a foreign country, or textiles which are to be exported to a foreign country after being made into manufactured goods.

\*        \*        \*        \*        \*        \*        \*

ARTICLE 12

Every person intending to manufacture or sell textiles shall declare such intention to the Government; but this does not apply when he intends exclusively to manufacture textiles coming under the provisions of Art. 3 par. 1 (2).

\* \* \* \* \* \* \*

REGULATIONS FOR THE ENFORCEMENT OF THE TEXTILE CONSUMPTION TAX LAW

(Imperial Ordinance No. 185 of March, 1910, as revised by Imperial Ordinances No. 45 of the year 1919, No. 585 of the year 1920, No. 50 of the year 1922 and No. 38 of the year 1926.)

\* \* \* \* \* \* \*

Any person who desires to have consumption tax remitted in respect of textiles for export to a foreign country or textiles intended for export to a foreign country, after having been turned into manufactured goods, shall obtain the approval of the competent Tax Office each time delivery is taken from the manufactory; but the formality of obtaining such approval may be dispensed with in case of a manufacturing place where textiles are manufactured solely for export, should the competent Tax Office have no objection in so far as supervision is concerned. The same applies to manufacturing places where textiles intended solely for export to a foreign country after being turned into finished goods are manufactured, if the competent Tax Office has no objection in so far as supervision is concerned.

Section 402 (a) (1) of the Tariff Act of 1930 provides that the value of imported merchandise shall be the foreign value or the export value, whichever is higher. The foreign value and the export value are both defined as "the market value or the price at the time of exportation at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported" including the cost of packing and containers. The only material difference between the two definitions is that the export value is limited to the value of merchandise sold for exportation to the United States whereas the foreign value is not so limited.

Under section 501 of the Tariff Act of 1930 the appraiser's return has been given the presumption of correctness and the burden is cast upon the importer to establish every material fact necessary to overcome that presumption. Therefore it must be assumed that the appraiser found that there was a difference between the foreign value and the export value of the articles in this case or of similar merchandise and that, inasmuch as he appraised the merchandise at what he considered the foreign value thereof, the foreign value was higher than the export value.

The record shows that the invoice prices of the goods are the export values of such or similar merchandise and that the only difference between the invoice prices and the appraised values is represented by an amount equal to a Japanese consumption tax which was added on entry by the importers.

As it is shown in Exhibit 12 that the articles represented by Exhibits 1, 2, 3, and 5 were made up specially by Kikusui Shokai for the Takemura Co. and were sold to no one else and that the

slippers represented by Exhibit 4 were manufactured by Kameyama Shoten according to a contract with Takemura, and the same styles were not sold to anyone else, it is apparent that the particular goods in this case were not freely offered for sale in Japan and that there is neither a foreign value nor an export value for identical goods. Therefore, the question for consideration is whether there was either a foreign value or an export value, or both, for similar goods, and whether either of those values included the Japanese consumption tax.

A summary of the salient parts of the record shows that there is little conflict in the evidence. It appears that a Japanese consumption tax is assessed on woven fabrics of rayon by the Japanese Government, but that tax is remitted on goods destined for export, either in the form of fabrics or of articles made of those fabrics, and that the Japanese Government interprets the provisions of the law liberally in order not to hamper the export trade. Rayon fabrics are woven in various widths. Witness Komatsu testified that the wider fabrics are manufactured for export and his statement is corroborated by the affiants who executed the affidavits in Exhibits 6 and 7. The only apparent conflict in their testimony is as to the width of the fabrics sold for domestic use. Witness Komatsu stated that rayon in widths of 12 and 24 inches is used solely by the Japanese natives in Japan, while it is stated in Exhibits 6 and 7 that the rayon fabrics used by the Japanese people are limited to those 13½ inches in width.

The goods covered by this appeal are articles, such as pajamas, kimonos, and slippers, made from rayon fabrics, and they were all made from the wider-width fabrics, that is fabrics of 26, 27, and 36 inches in width. The weight of evidence shows that the native Japanese do not wear pajamas at all and the rayon kimonos they wear are made of narrow fabrics of subdued colors of a different quality of material and that the articles have a different cut and a different kind of embroidery. Articles of the same class as the goods herein involved are sold in wholesale quantities to tourists' shops in Japan and they are subsequently sold in those shops at retail to tourists or foreigners residing in Japan. There is some testimony showing that the goods sold to tourists' shops are made of better quality fabrics having a different texture than the articles sold for export. When the articles are sold at wholesale to tourists' shops, the tax is not included in the wholesale price, but when the articles are purchased at the tourists' shops at retail, the tourists' shops pay the tax if the purchaser takes the articles away from the stores. If the purchaser has the article delivered to the steamer on which he is a passenger, the tourist shop does not pay any tax. The dealers are obliged to keep accurate account of all sales for the Government records.

The record establishes also that rayon fabrics of wide widths, and articles made therefrom, of a value of approximately 136,000,000 yen,

were exported from Japan to countries other than the United States during the year 1935 in quantities of 100 dozen pieces of a value of 1,000 yen, and such merchandise was not subject to the Japanese consumption tax. Those articles appear to be similar to those herein involved. The record shows also that articles made of wide-width rayon fabrics to the value of approximately 300,000 yen were sold to tourists' shops in Japan in quantities of one or two dozen pieces. It is obvious that the major portion of sales in such goods was for export to countries other than the United States.

In the case of *United States* v. *Livingston & Southard, Inc.* 23 C. C. P. A. 214, T. D. 48060, the court held that unrestricted sales to countries other than the United States should be considered in arriving at the foreign value of imported merchandise. The court said at page 220:

* * * It is our opinion that, under said section 402 (c) all unrestricted offers for sale, such as those in this case at bar, in the principal markets of the country from which the merchandise is exported, whether for home consumption or for export to countries other than the United States, should be considered in arriving at the foreign value of imported merchandise.

By adopting the principle announced in the case cited, it is clear that the sales to countries other than the United States must be considered in determining the foreign value of goods similar to those covered by the instant importation. Those sales, which included both fabrics and articles made therefrom, were made at prices which did not include the Japanese consumption tax, and the sales of articles made from rayon fabrics were made in usual wholesale quantities of 100 dozen pieces.

But the sales of rayon fabrics to manufacturers of articles to be sold to tourists' shops and the sales of the articles to tourists' shops in the wholesale quantities of one or two dozen pieces were made also at prices which did not include the Japanese consumption tax. So it appears that the Japanese consumption tax was not a part of the value in either class of sales in wholesale quantities whether made to tourists' shops or to countries other than the United States. The question of difference in quality of the fabrics in the articles sold to tourists' shops and those sold for export becomes immaterial because the tax was not included in the sale in wholesale quantities in either case. The sales at retail to the tourists, whether or not the tax was paid on the articles at the time of sale, do not alter the situation. It is not contended that sales were made by the shops to tourists in the usual wholesale quantities.

As compared with the sales to tourists' shops, the sales to countries other than the United States constituted the major portion of the sales. It is stated in Exhibit 6 that the usual wholesale quantities of those sales was 100 dozen pieces. In the case of *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093, the court held that

while a statement in an affidavit giving a quantity as the usual whole-sale quantity might in some circumstances be regarded as some substantial evidence of the fact, such a statement can have no weight as a statement of fact when all of the facts upon which the statement is made are disclosed. The court said, however, that no question of usual wholesale quantity can arise in a case, such as this, where the price at which an article is sold does not vary according to the quantity sold. The court said:

> Of course, where the price at which an article is sold does not vary according to quantities sold, no question of usual wholesale quantity can arise, and in such case a single article may sometimes be regarded as a usual wholesale quantity.

This case presents an issue similar to that in *United States* v. *Allenby & Co.*, 20 C. C. P. A. 80, T. D. 45703, wherein the question raised was whether the Japanese consumption tax should be added to the export value of wide-width silk fabrics, it having been shown that the native Japanese used only fabrics 13½ inches wide for their own use and that silks of wider widths made for export were not of the same character, width, weave, or design as the silks used for domestic consumption, the only wide width fabrics sold in Japan being rejects of export silks which were sold in small quantities and were used for making up into articles sold in the export trade or to tourists' shops. The text of the law quoted in that decision appears to be the same as that in Exhibit 13 in this case and the amendments of that law reported in Exhibit 10 do not change the meaning of the Japanese consumption-tax law considered in that case insofar as the issue in this case is concerned. In that case, Division One of the United States Customs Court held, as reported in T. D. 44606, that the Japanese consumption tax was assessed on goods used for consumption in Japan only and that it should not be added to the value of export silks, that is, silks of wide widths of different character from the silks used for home consumption. The decision on that point was affirmed by the appellate court. A similar conclusion was reached in a former decision. *United States* v. *Iwai & Co. et al.*, 16 Ct. Cust. Appls. 542, T. D. 43265.

I find that the weight of evidence supports the following facts:

1. The sole question in issue herein is whether at the time of exportation there was a difference between the foreign value and the export value of the goods in this case equal to the Japanese consumption tax assessed on rayon goods for consumption in Japan.

2. The merchandise the value of which is involved herein consists of articles such as pajamas, kimonos, and slippers made from wide-width rayon fabrics, and which are manufactured under contract specially for export to the importers.

3. The Japanese natives do not wear pajamas and the kimonos used by them are substantially different in cut and style of embroidery from the kimonos in the instant importation.

4. Rayon fabrics used for consumption in Japan by the Japanese natives at and immediately prior to the exportation of the merchandise herein involved, and upon which the Japanese consumption tax was assessed, differed in width, color, quality, and texture from those in the articles the value of which is in issue herein and differed in width, color, quality, and texture from the rayon fabrics used to make similar articles sold in the principal markets of Japan in the ordinary course of trade in wholesale quantities to tourists' shops and to countries other than the United States.

5. As the articles described in finding 2 were made under special contract with Takemura Co., were purchased by that company on order from the importers in this case and were not sold to anyone else, they were not freely offered for sale in Japan either for home consumption or for export.

6. Similar articles were sold in the principal markets of Japan in the ordinary course of trade in wholesale quantities of 100 dozen pieces for exportation to countries other than the United States at and immediately preceding the exportation from Japan of the merchandise in this case at prices which did not include the Japanese consumption tax.

7. Similar articles made of a better grade of material were sold in wholesale quantities of one or two dozen pieces to tourists' shops in Japan at prices which did not include the Japanese consumption tax, but when the tourists' shops sold the articles at retail to tourists, or to persons living in Japan, the tourists' shops paid the tax to the Government of Japan, except in cases where the tourists' shops delivered the goods to the steamer on which the tourist was a passenger, in which case no tax was paid.

8. The major portion of sales of articles similar to those in this case were made to countries other than the United States.

Under the foregoing facts, I hold that there was neither an export nor a foreign value for articles identical with those in the instant importation because they were not freely offered for sale in Japan either for home consumption or for export; that there was a foreign value for similar articles sold in wholesale quantities in the ordinary course of trade in Japan to countries other than the United States and also to tourists' shops, although the quality of the fabrics in the articles sold to tourists' shops was slightly different, which value in both cases did not include an amount equal to the Japanese consumption tax; that inasmuch as the major portion of sales in wholesale quantities was made to countries other than the United States, the sales to such countries should be adopted as a criterion in determining the foreign value; that as the Japanese consumption tax was not assessed on similar goods sold to foreign countries, the tax is not a part of the foreign value of similar goods; that the foreign value of similar merchandise is the same as the export value thereof.

Accordingly, the articles in issue in this case are appraised at the entered and appraised values, less the amounts added under duress by the importers to meet advances made by the appraiser on entries of other shipments.

Judgment will be rendered accordingly.